UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JANE BUCKINGHAM<br><br>        Defendants. | No. 1:19-cr-10117-IT |

## DEFENDANT'S SENTENCING MEMORANDUM

Jane Buckingham committed a crime in order to obtain an unfair advantage for her son. She knew what she did was wrong, she accepted responsibility for her crime as soon as she was arrested—from that very first day, when she told her children that she would plead guilty—and she continues to demonstrate remorse for what she has done. Ms. Buckingham understands that her crime must be punished. She respectfully submits that a one-year term of probation, and such fine and community service as the Court deems appropriate, would be sufficient but not greater than necessary to punish her, taking into account all of the circumstances particular to Ms. Buckingham's case.

## BACKGROUND

### Ms. Buckingham's Background

Ms. Buckingham was born in New York, where she and her brother were raised by their mother after their parents divorced.[1] Her mother died when she was 21, leaving behind significant debt. After graduating from college, Ms. Buckingham embarked on a successful

---

[1] Additional, substantial information about Ms. Buckingham's background is contained in the Presentence Report and the letters submitted herewith.

marketing career. She has built two companies from scratch, including Youth Intelligence, which she sold in 2003, and she has published several books. She is currently the owner of Trendera, a boutique marketing firm which she founded. Ms. Buckingham is the face and the driving force behind the company. She is the sole partner and business generator, and her five employees (three of whom had no professional marketing experience before Ms. Buckingham hired them) rely on her and Trendera for their livelihood.

Ms. Buckingham married her ex-husband, Marcus, in 1996, and they had two children, a son and a daughter. They separated in 2016 and divorced in 2018. The separation process was extremely difficult and the relationship is still acrimonious. In the three and a half years since the Buckinghams separated, their children have lived with Ms. Buckingham full-time, and have spent only a handful of nights with their father. After Ms. Buckingham's arrest, her ex-husband did not seek any greater contact with his children, but instead sold his house and moved from Los Angeles to San Diego. He has no regular visitation schedule with either child, and has only sporadic contact with them (mostly through social media, email, and texts). Ms. Buckingham's son, ▇, is now a freshman at ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and her 16-year-old daughter, ▇, is a junior in high school. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* PSR ¶ 90.

**Ms. Buckingham's Crime**

Ms. Buckingham hired Rick Singer as a legitimate college counselor for her son in 2017, after he was recommended by a friend. Mr. Singer provided lawful counseling services for over a year: he met ▇▇▇▇▇, he recommended extracurricular activities (such as being a manager for a traveling basketball team over the summer), and he advised on the schools ▇▇▇▇ should

consider. Ms. Buckingham trusted Mr. Singer's advice. ██████████████████████

██████████████████████████████████████████████████████████████████

PSR ¶ 34 n.3. ██████████████████████████████████████████████████████

██████████████████████████████████ See Ex. B at 2-3 (██████████ Letter).

However, Mr. Singer told ████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████[2]

At that point, Ms. Buckingham agreed to Mr. Singer's proposal to cheat on the ACT. ██████████████████████████████████████████████████████████████████

████████████████████████████████████████████ PSR ¶ 34 n.3. Mr. Singer arranged for ████ take the ACT at a test center in Houston, Texas. Two days before the test, ████ doctor advised against allowing him to travel due to medical issues. PSR ¶ 39. Ms. Buckingham and Mr. Singer decided that Mr. Singer's proctor would take the test in Houston,

---

[2] ██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

3

and Mr. Singer would provide a test for ▇ to take at home. *Id.* ¶¶ 39-40. Ms. Buckingham secured a handwriting sample from ▇ by telling him the sample would be used to verify the hand-written essay portion of his exam.

Ms. Buckingham did not tell ▇ about the scheme; she did not want him to know about it or be involved. She had planned for him to take the test in Houston, and then have his answers corrected after the fact without his knowledge. When she learned ▇ would not be able to travel to Houston, Ms. Buckingham requested that Mr. Singer provide her with a test to administer ▇ at home (and even followed up when Mr. Singer did not send one right away). *Id.* ¶¶ 40, 44. Ms. Buckingham took these steps to protect her son from learning about her crime. After ▇ took the test, Ms. Buckingham mailed the completed test to Mr. Singer.

Several months later, when Mr. Singer called Ms. Buckingham at the direction of law enforcement agents, they discussed the possibility of doing the same thing for Ms. Buckingham's daughter. *Id.* ¶ 47. However, Ms. Buckingham did not pursue that scheme. Ms. Buckingham also discussed with Mr. Singer the possibility of having her son apply to USC using Singer's connections in the athletic department, but shortly after that conversation she elected not to pursue that route. *Id.* ¶ 53.

**Ms. Buckingham's Acceptance of Responsibility**

Ms. Buckingham was arrested on the morning of March 12, 2019. When she got home that night, she told her children that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. B at 5-6 (▇▇▇▇▇ Letter). Just one week later, on March 19, 2019 (days before the deadline imposed by the Government), Ms. Buckingham's counsel informed the Government that she would plead guilty.

4

Soon thereafter, as part of her desire to atone, Ms. Buckingham chose to meet with and be interviewed by more than a half-dozen prosecutors and FBI agents for over an hour on April 17, 2019, supplying all relevant information she had relating to this case, and answering all questions put to her.[3]

Ms. Buckingham has never wavered from owning full responsibility for what she did. As her son wrote in his letter: █████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

██████████████████████████████ Ex. B at 1 (██████

Letter).

Ms. Buckingham's remorse is evident to all those who know her, and she has acknowledged her guilt to her friends and family. Her brother wrote: "Jane made a choice—a very bad one. She knows that she is responsible for that choice and feels shame and guilt about it every moment." *Id*. at 10. Melissa Thomas, who has known Ms. Buckingham for twenty-five years, recounted that Ms. Buckingham "is withering and self-lacerating when talking about her own behavior," "is in full acknowledgment of her guilt, and makes no excuses for her poor choices, or complaint about the way in which society has reacted," and would be "horrified" if she thought Ms. Thomas "was attempting to rationalize her behavior" as "she is scrupulously forthcoming and deeply sorrowful about her culpability." *Id*. at 31. Another friend, Christine Belgrad, wrote: "We have had numerous emotional conversations since then about how wrong

---

[3] During this meeting, Ms. Buckingham—noting that she had fainted at the time of her arrest—also expressed her gratitude to the FBI agents who arrested her, for their kindness and professionalism.

5

her actions were and how deeply sorry she is for them. She has been willing to accept the consequences from the beginning and talks about it openly and candidly in front of her children. I admire her for taking full responsibility." *Id.* at 56.

Ms. Buckingham is particularly remorseful about the effects that her crime has had on other students and families who played by the rules. She knows that her crime was wrong not simply because she broke the rules, but because she tried to cheat a system in which she and her family already enjoyed many advantages. She wrote:

> I will never forgive myself for committing this crime. I knew better, and I didn't follow my own sense of right and wrong. My family and my children have been lucky to have so many advantages that other families and children do not. And yet I committed a crime so that my son could have another advantage, an unfair and illegal one. It was a terrible thing to do. Every day I regret having made that choice. I have hurt the parents and students who don't have the resources my family has.

Ex. A (Jane Buckingham Letter).

## ARGUMENT

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 51 (2007). As such, this Court must base its sentencing decision on the history and characteristics of Ms. Buckingham, the nature and circumstances of the offense, and all of the other factors enumerated in 18 U.S.C. § 3553. Ms.

Buckingham believes that a sentence of one year of probation, and such fine and community service as the Court deems appropriate, is appropriate in this case for the reasons set forth below.

I. **THE NATURE AND CIRCUMSTANCES OF THE OFFENSE, AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

    A. **The Nature and Characteristics of the Crime**

Ms. Buckingham's crime, while serious, was not as egregious as those committed by other defendants in this case:

- Ms. Buckingham did not hire Mr. Singer in order to commit a crime. He was recommended to her as a legitimate college counselor, and he provided lawful counseling services to her son for over a year before Ms. Buckingham agreed to his proposal to cheat.

- Ms. Buckingham did not seek testing accommodations in order to engage in the fraud. ████████████████████████████████████ before Ms. Buckingham agreed to Mr. Singer's scheme.

- Ms. Buckingham did not involve her son in the fraud. To the contrary—she took steps to prevent her son from finding out about the fraud. Even though Mr. Singer told Ms. Buckingham that his proctor could take the test without her son being present, Ms. Buckingham requested a copy of the test to administer to her son, as that was the only way to prevent him to learning of her crime.

- Ms. Buckingham was not a repeat player. She cheated on only one test, and for only one of her children.[4]

- Ms. Buckingham only participated in the test-taking scheme.[5]

---

[4] Although impossible to demonstrate because of Ms. Buckingham's arrest, it is far from clear that Ms. Buckingham would have pursued the same scheme again several years later, as the government wants you to infer. She demonstrated on various recordings that she was uncomfortable with what she had done, and she demonstrated that she had developed enough resolve to resist Mr. Singer by declining to pursue the "side door." Moreover, Ms. Buckingham did not pursue any further discussions with Mr. Singer on this subject, even though she called and spoke with him again after the idea was first raised. In addition, it is unclear ████████████████████████████████████

[5] The Government will argue that Ms. Buckingham discussed with Mr. Singer the possibility of her son applying to USC through the athletic route. But the evidence as to those discussions is limited, and does not demonstrate that any agreement was made to pursue USC admission in that manner. Even the Government acknowledges that Ms. Buckingham decided not to pursue that route, and there is no question that if Ms. Buckingham had actually pursued a scheme to defraud

7

Ms. Buckingham is also fortunate that, in her case, she did not, in fact, steal a spot from another student—though she recognizes that does not have any reflection on the severity of her crime. Although Mr. Singer convinced Ms. Buckingham and ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. PSR ¶ 90. Ms. Buckingham's crime did not have the same effect as that of other defendants who took spots that would almost certainly have been awarded to other students, and those other students were also victims in those cases. There is no question that Ms. Buckingham committed a crime, and SMU's decision certainly does not diminish the seriousness of her crime. However, the aggravating factor that was present in other cases (actually depriving another student of a spot) is not present here.

Further, there is no reason to distinguish Ms. Buckingham from the other defendants based on the fact that ▬ took the test at home. All of the other children in the test-taking scheme took the test under illegitimate circumstances, under the supervision of a corrupt proctor who corrected their scores, and none of them obtained their scores based on the answers they actually chose. Only one of the children in the test-taking scheme is alleged to have known that the proctor was correcting her scores. To distinguish ▬ from the other children who unknowingly had their scores changed after they took the test could lead some to infer ▬ was aware of the fraud. Such a suggestion would not only be prejudicial ▬, who has not been accused by the Government of any misconduct in this case, and who has stated that he was not involved in any wrongdoing—but would not be supported by the facts.

---

USC, she would have been charged with it. Therefore, the Court should not consider the Government's suggestion that Ms. Buckingham was willing to participate in the "side door" scheme.

8

The Government's argument that Ms. Buckingham's actions make her an "active" rather than a "passive" participant is logically inconsistent. *See* ECF No. 423 at 24. Ms. Buckingham did not take affirmative steps to conceal her fraud from the ACT nor did she take steps to force ACT to release her son's score. Rather, the "active" steps that the Government points to are steps that Ms. Buckingham took to conceal the fraud *from her son*. The Government then cites the involvement of children—the very thing that Ms. Buckingham was trying to avoid—as an aggravating factor. In concealing her fraud from her son, Ms. Buckingham acted no differently from the parents who had to lie to their children about why they were taking the SAT or ACT at a test center in Los Angeles or Houston even if that was hundreds or thousands of miles away from their home. And unlike other parents who put their children at risk by letting them learn of and participate in the fraud, Ms. Buckingham succeeded in preventing her son from learning of her crime.

### B. Ms. Buckingham's Acceptance of Responsibility

As described above, Ms. Buckingham immediately and unwaveringly accepted responsibility for her crime. She did not issue a public statement for strangers to comment on and media to dissect; instead, she demonstrated her remorse every single day, to the people who are closest to her. She told her children on the day of her arrest that she would be pleading guilty. She had spent the day in jail, after having lost consciousness upon her arrest, and when she got home her first priority was making sure her children understood that she would be accepting responsibility for her crime. She has also discussed her guilt frankly and candidly with friends and family, even under uncomfortable circumstances. *See* Ex. B at 17 (Norah Weinstein Letter); *id.* at 19 (Brian Weinstein Letter).

Ms. Buckingham's acceptance of responsibility was immediate after her arrest because she already understood that she had committed a crime. Unlike other defendants, she never tried

9

to convince herself that her actions were legitimate. And unlike Peter Jan Sartorio, whose understanding of wrongdoing was inferred from the fact that he tried to *conceal* his actions by making multiple smaller cash withdrawals rather than paying with a check, Ms. Buckingham's understanding of wrongdoing was clear and recorded months before her arrest. She called Mr. Singer in November 2018 after her ex-husband sent her a note saying he was upset about what she had done, because she believed that he was referring to her crime and she wanted to know if Mr. Singer had spoken with her ex-husband. PSR ¶ 48. That recorded conversation clearly demonstrates that Ms. Buckingham, like Mr. Sartorio, knew that she had committed a crime. Like Mr. Sartorio, Ms. Buckingham made no attempts to lie to herself. Thus, acceptance of responsibility is another distinguishing factor for Ms. Buckingham, just as it was for Mr. Sartorio.

### C. Ms. Buckingham's History and Characteristics

Ms. Buckingham is not the woman the Government tries to portray her to be.[6] Dana Oliver, who has known Ms. Buckingham for thirty years, states that "[t]here is not one entitled bone in her body." Ex. B at 34. The letters submitted by Ms. Buckingham's friends and family describe a woman who is kind, giving, and generous—not just with money, as one might expect given her resources, but with her time. When her friend, Sarah ▮▮▮▮, was diagnosed with ALS about ten years ago, Ms. Buckingham took in and provided for the whole family for a year, and has visited her on a weekly basis since. *Id.* at 11-12 (Sarah ▮▮▮▮ letter); *id.* at 13 (Claire Gladstone Letter). Ms. Buckingham's commitment to her friend is "absolutely unparalleled": "I

---

[6] The Government has urged the Court to consider the wealth and privilege of the defendants in this case in imposing a sentence. While Ms. Buckingham's success is certainly a factor in that she has no extenuating circumstances to blame for her crime, she should not face a harsher sentence solely because of her wealth, which is what the Government is advocating here.

10

have watched her spoon feed Sarah, fill and give her medicines, handle her choking, walk her, talk for her. She does it completely behind the scenes." *Id.* at 15 (N. Weinstein Letter).

The letters also speak to Ms. Buckingham's volunteer work and her commitment to the community. She has dedicated thousands of hours to Baby2Baby, a non-profit which provides basic essentials to children living in poverty. *See, e.g.*, *id.* at 15-17 (Norah Weinstein Letter); *id.* at 53 (Sara Happ Letter) ("She refuses, each year, to stand at the Baby2Baby fundraiser when they ask their key members to rise and be applauded for their work. She simply won't do it. You see, Jane gives silently, humbly, and from a place of pure generosity. She asks for nothing in return."). She has also spent many years working with the UCLA Rape Treatment Center and its affiliate Stuart House, which helps children and adult victims of sexual abuse and assault. Since her arrest, she has been volunteering at Chrysalis by folding and sorting clothes for homeless individuals and others in poverty who need help getting a job. *Id.* at 21-22 (Loranger Letter). Ms. Buckingham tries to make a difference in any way that she can. *See id.* at 25-26 (Kaye Kramer Letter) (describing how Ms. Buckingham "has hired low-income, female, teenage interns from underserved Los Angeles communities for many years, so that they can have a paid experience working in an office, the opportunity to learn about Marketing and the chance to begin to build a resume").

The letters and stories from the people who know Ms. Buckingham best, and not the broad generalizations of the prosecutors, tell the true story of who she is. None of these letters or stories serve as an excuse or justification for Ms. Buckingham's crime, and they are not being offered for that purpose. But they do provide a glimpse into who Jane Buckingham is as a

person—and it is that person, and not the stereotypes offered by the Government, who is before the Court for sentencing.[7]

      **D.**      <u>**Ms. Buckingham Is a Single Parent**</u>

Courts in this district and across the country have overwhelmingly sentenced defendants similarly situated to Ms. Buckingham to probation. *See* ECF No. 425 & Ex. C (discussing sentencing data for defendants with 0-6 month Guidelines range, no criminal history, and Guidelines range calculated under § 2B1.1). Those courts have all recognized, consistent with the Application Note to USSG § 5C1.1, that imprisonment is not necessary to punish, deter, or rehabilitate non-violent first offenders like Ms. Buckingham, and that the social costs of incarceration outweigh any public benefit in almost all of these cases. In this case, an additional and important consideration is the fact that Ms. Buckingham is a single parent, whose minor child (a 16-year-old daughter) has lived solely with her for the last three-and-a-half years. Ms. Buckingham's ex-husband lives in San Diego—several hours away—and their daughter has only stayed with him on a handful of occasions during that time. Ms. Buckingham's daughter writes that ███████████████████████████████████████████████████████████████████████████████████████████ Ex. B at 5 (█████████ Letter). Ms. Buckingham's son added: ███████████████████████████████████████████████████████████████████████████████████████████ *Id.* at 3 (█████████ Letter). Ms. Buckingham's parents are both deceased and she has no other family nearby who could care for her daughter. While Ms. Buckingham understands that single parents are not immune from incarceration and that this Court does and has sentenced other single parents to prison, this Court has also considered family circumstances

---

[7] As the letters also reflect, Ms. Buckingham is the sole caregiver for her minor daughter. If she were to be incarcerated, there is no other family who is able to care for her daughter while she is away.

as a factor in choosing to sentence defendants to probation instead of incarceration in cases involving much higher Guidelines calculations. *See* Statement of Reasons at 3, *United States v. Johnson*, 15-cr-10389-IT (D. Mass. 2017), ECF No. 153.

The government has assembled, in a detailed brief, the cases it considered most supportive of its demands for jail, and none of them are cases in which a court sentenced a single parent to prison when that defendant had a sentencing range of 0-6 months and was a first time offender. We have searched and believe there are none. The Government can offer no reason as to why the Court is unable to fashion an appropriate sentence that does not include incarceration. The Government has pointed to the need for consistency across cases, but Ms. Buckingham is the only parent in this unique situation. Each of the other defendants in this case, except for the Abbotts, has a spouse who can care for any minor children while they are imprisoned; and in the case of the Abbotts, the Court permitted the defendants to stagger their self-surrender dates so that one parent could always be at home to care for their minor daughter. Ms. Buckingham's family situation is unique among this group of defendants and should be taken into account in determining an appropriate sentence.

## II. SPECIFIC AND GENERAL DETERRENCE

A sentence of probation also supports the goals of both specific and general deterrence. As to specific deterrence, there can be little doubt that Ms. Buckingham is not at risk of recidivism. She is a first time offender. She has already suffered consequences as a result of her arrest and conviction—which is not to say that she should not be punished, but the impact to her life is certainly a factor in considering whether she is at risk of reoffending.

Ms. Buckingham also recognizes the need to deter similarly situated individuals from cheating the system and thinking that they can get away with it because of their privilege. But Ms. Buckingham's arrest and conviction have already served that goal. Prior to this prosecution,

13

most cases of cheating on standardized tests were not even prosecuted. The SAT, for example, was aware of 150 cases of cheating by impersonation each year (in addition to many other cases of cheating in other ways), and those cheating cases were not even reported to the schools. *See* Valerie Strauss, *When Kids cheat on SAT, ACT*, Washington Post, Mar. 25, 2010, *available at* http://voices.washingtonpost.com/answer-sheet/college-admissions/when-kids-cheat-on-sat-act.html. Cheating on standardized tests typically resulted in prosecutions only if they involved an additional crime, such as the forgery of an identification document. *See, e.g.*, *United States v. Xinyan Wang*, 1:17-cr-10402-IT (D. Mass.). But after all of the publicity surrounding this prosecution, there can no longer be a perception that cheating is a crime that does not get reported or prosecuted. Any parent that is presented with the choice that Mr. Singer offered Ms. Buckingham will certainly stop to think about the ramifications of that choice, and a term of imprisonment for Ms. Buckingham is not required to send that message. Indeed, surely there are other coaches in the country who have been deterred from participating in a "side door" scheme even though the only coach to be sentenced thus far, John Vandemoer, received a sentence of probation. Further, eight parents have already been sentenced to prison in this case. It is not necessary to sentence every parent to prison in order to send a message of general deterrence, and Ms. Buckingham's particular circumstances mean that a sentence of probation in this case will not detract from the overall general deterrence effect that this Court's sentences have conveyed.

## CONCLUSION

For the foregoing reasons, Ms. Buckingham respectfully requests that this Court impose a sentence of probation, along with such fine and community service as the Court deems appropriate.

14

Dated: October 16, 2019  Respectfully submitted,

/s/ Joseph F. Savage
Joseph F. Savage (BBO #443030)
Yvonne W. Chan (BBO# 669223)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts
Tel.: (617) 570-1000
Fax: (617) 523-1231
JSavage@goodwinlaw.com
YChan@goodwinlaw.com

Michael J. Proctor (*pro hac vice*)
DURIE TANGRI LLP
530 Molino Street, Suite 111
Los Angeles, CA 90013
Tel.:    213-992-4499
Fax:    415-236-6300
mproctor@durietangri.com

*Attorneys for Defendant Jane Buckingham*

## **CERTIFICATE OF SERVICE**

       I, Joseph F. Savage, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 16, 2019.

       /s/ Joseph F. Savage